## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES HOLLINGHEAD, and** | : | **Civil N. 1:12-CV-260** |
| **MARK SIMPSON,** | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiffs** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **CITY OF YORK, PENNSYLVANIA,** | : | |
| **YORK SEWER AUTHORITY, and** | : | |
| **MONACACY VALLEY** | : | |
| **ELECTRIC, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

In this case, two African-American plaintiffs, James Hollinghead and Mark Simpson, have brought claims under federal and state law alleging that the City of York and the York Sewer Authority discriminated against them on the basis of race, and retaliated against them after they complained of a specific instance of perceived workplace intimidation and racial discrimination. Specifically, these claims arose out of an incident that occurred in July 2010, when James Hollinghead discovered what he believed to be a noose hanging within a building at the York Wastewater Treatment Plant in York, Pennsylvania that was undergoing substantial construction

activity, including extensive electrical work being performed by Monacacy Valley Electric, Inc.  Although he lacked any direct proof, Hollinghead was convinced that one or more unidentified employees of Monacacy must have placed the noose in order to harass or intimidate him and other African-American employees.

Hollinghead informed his union steward, Mark Simpson, about the matter, and Simpson in turn brought it to the attention of officials with the City of York – including the Mayor.  These officials then promptly investigated the incident, and the City of York's Mayor, C. Kim Bracey, directed the police department to undertake a criminal investigation into the matter to determine whether a hate crime may have occurred.  Ultimately, these investigations – which involved multiple interviews with witnesses, conducted by multiple parties – were inconclusive, and it was determined that it was just as likely that the rope Hollinghead observed may have been used in connection with the movement of conduit or other construction materials within the building.  It was also never determined who placed the rope in the location where Hollinghead first saw it, and, therefore, no one was ever accused of wrongdoing in connection with this incident.  Ultimately, the investigations into Hollinghead's and Simpson's claims were inconclusive.

In this case, Hollinghead and Simpson claim that in addition to responding inadequately to the perceived instance of intimidation and racial discrimination, their

employer subsequently retaliated against each of them by directing them to undertake dangerous work assignments that resulted in each man sustaining injuries. Hollinghead and Simpson pursued administrative relief before the Equal Employment Opportunity Commission, and subsequently brought this federal lawsuit alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), 42 U.S.C. § 1983 for alleged First Amendment retaliation and 14th Amendment violations, and under 43 Pa. Cons. Stat. Ann. §§ 951 et seq. (the "PHRA").

This action now comes before the Court on two motions for summary judgment filed by the remaining two defendants, the City of York and the York Sewer Authority. The motions remained dormant for a period of time while the parties engaged in what were partially successful efforts to mediate a settlement of the plaintiffs' claims.[1] The motions are now fully briefed and ripe for disposition. For the reasons that follow, it is recommended that the motions be granted in their entirety, because there is insufficient evidence to support the plaintiffs' claims under any legal theory in this case.

---

[1] The parties represent that Mark Simpson settled his claims against the City as part of a global settlement related to a workers' compensation dispute.

## II.   **BACKGROUND**

James Hollinghead is employed by the City of York as a wastewater treatment plant operator.  (Doc. 61, City of York Statement of Facts ("City SMF") ¶¶ 1-2) Mark Simpson is also an employee of the City of York, and has worked at the Wastewater Treatment Plant for more than 13 years, and during the time relevant to this action was employed as a filter dryer operator.  (Doc. 56, York Sewer Authority Statement of Facts ("Authority SMF") ¶¶ 51-52; Doc. 75-1, Aff. of Mark Simpson, ¶ 2)  Simpson was a union steward at the time of the incidents alleged in this case.

During 2010 and 2011, the York City Wastewater Treatment Plant was undergoing construction work.  During this time, at least four contractors were working in a building known as the Ostara Building, which is part of the Wastewater Treatment Plant.  The record is somewhat in dispute as to which of the contractors may have been working within the Ostara Building in July 2010, but it is undisputed that one of these contractors was Monacacy Valley Electric, Inc. ("Monacacy"). Monacacy employees were performing electrical wiring and related work within the Ostara Building pursuant to a contract with the Authority, including the installation of new breakers and running new conduit throughout the building.  (City SMF ¶¶ 9, 13.)

4

In July 2010, Simpson was working in a building at the Wastewater Treatment Plant known as the Solids Handling Building, which is connected to the Ostara Building.  (Id. ¶¶ 14, 15.)  Simpson did not work in the Ostara Building, but would nevertheless use a bathroom and locker room in that facility from time to time.  (Id. ¶ 14.)  During that time, Simpson complained to Chad Arnold, the Process Control Manager at the Wastewater Treatment Plant about the condition of the shower in the Ostara Building.  (Id. ¶ 15.)  Apparently, Simpson complained that workmen had been standing in the shower with muddy boots on and had left the shower in a muddy condition.  (Id.)  Simpson first brought his complaint to the foreman from Monacacy, but he did not care about the matter, and refused to do anything about it.  (Id.)  Arnold told Simpson to put a lock on the bathroom door, which Simpson did.  (Id. ¶¶ 15-16.)  However, someone from Monacacy approached Arnold and informed him that the electricians needed access to the bathroom in order to complete their wiring work, and the bathroom was thereafter unlocked.  (Id. ¶ 16.)

On July 16, 2010, Hollinghead discovered what he believed to be a noose hanging two to three feet above his head, dangling from a beam in the ceiling near the bathroom in question.  (City SMF ¶ 21.)  Two days later, Hollinghead brought this discovery to Simpson's attention.  Simpson, the union shop steward, informed Chad Arnold about the matter on July 19, 2010, a Monday.  Two days later, Simpson

reported the matter to Steve Douglas, the Plant Manager. (Authority SMF ¶¶ 23-24.)
Hollinghead did not actually see anyone hanging the rope, but he is nevertheless
certain that it was placed by someone employed by Monacacy. (Id. ¶¶ 25-26.) On
August 26, 2010, Hollinghead submitted a formal grievance about the matter with the
City of York. (City SMF ¶ 19.) This grievance alleged that there has been "racial
intimidation by outside contractor." (Id. ¶ 20.) This grievance appears to have
inspired the City of York to initiate a substantial inquiry in the matter, including the
following:

- Chad Arnold spoke with two supervisory employees of Buchart-Horn
  Engineers/Basco Associates, the company responsible for construction
  inspection services at the Wastewater Treatment Plant, to discuss the
  alleged noose and the potential involvement of any subcontractors;

- Chad Arnold went to the work site to view the hanging rope;

- Steve Douglas communicated with Ostara representatives in order to
  obtain photographs from within the building, some of which depicted
  ropes hanging from the ceiling more than one week before Hollinghead
  discovered the rope that he perceived to be a noose, which were being
  used to haul buckets or other material

- On July 22, 2010, Thomas Ray, the Business Administrator for Human
  Resources for the City of York was made aware of the incident by
  Mayor C. Kim Bracey, who directed him to investigate the matter and
  to determine if the rope had been placed for a racially motivated purpose
  or to intimidate Hollinghead and Simpson;

- Mayor Bracey directed the City of York Police Department to initiate a
  criminal investigation to determine if a hate crime had occurred;

- Thomas Ray conducted interviews with the following individuals: Mark Simpson; James Hollinghead; Chad Arnold; Rhonda Hyslop, the Project Representative for Ostara, the company that was working to takeover operations within the building; Larry Smith, the Project Representative for Monacacy; Kyle Smith, Project Representative for Walabax Construction Services, Inc., another subcontractor that had worked at the Wastewater Treatment Plant; City employees Frank Rizutto, Jessica Quinn, and Veronica Whaley-Chavez; and Steve Douglas, the Plant Manager;

- Detective Andy Baez conducted a criminal investigation into the incident; and

- Michael O'Rourke, Business Administrator for the City of York, considered a grievance filed by Hollinghead, and convened a meeting with Simpson, Hollinghead, and Mark Andreozzi, their local union representative, to address the matter.

As part of his investigation, Ray took notes during his interviews, and was provided with additional information that may have been relevant to his inquiry. Included among this information was pictures of one or more ropes that had been hanging in the building, and reports of multiple ropes used in the building for the purpose of hauling conduit, buckets, or other construction-related materials. During Ray's interview with Rhonda Hyslop, the Ostara representative, she told him that she had seen a rope hanging in the building as early as July 9, 2010, and that it was tied to a bucket; a picture depicting such a rope was also provided to Steve Douglas, the Plant Manager. Monacacy's Vice President, Larry Smith, told Ray that none of his

employees was involved in the incident, and told Ray that the rope was in the building when his crew began their work. Smith suggested that another contractor, Walabax, likely used the rope, and also charged that Walabax employees had tracked mortar into the shower area that inspired Simpson's initial complaints.

At the end of his investigation, Ray completed a written report of his investigation. (Doc. 62, Ex. 4-D)  Ray determined that there was no conclusive evidence that any particular contractor or individual placed the rope in the building for a racially motivated purpose or to intimidate Hollinghead or Simpson.  Ray found that although it was possible that the rope had been placed by someone to intimidate Simpson and Hollinghead, it was also equally possible that the rope, configured as it was when it was discovered by Hollinghead, was being used to raise or lower tools or conduit being used by Monacacy or mortar being used by Walabax.  Furthermore, Ray's investigation did not establish any connection between the rope found by Hollinghead, and another rope discovered later at a completely separate location.[2]

---

[2] This second rope was found outside of a wash bay where vehicles are cleaned, known as the MIPP Wash Bay, a separate building located some distance away from the Ostara building.  The rope was discovered on the ground by two female employees, Veronica Whaley-Chavez and Jessica Quinn, who brought it to Steve Douglas's attention.  There was never any connection found between this rope and the rope that Hollinghead discovered.  Moreover, after he issued his report about the incident involving Simpson and Hollinghead, Ray learned that the rope discovered outside the MIPP Wash Bay had fallen off the truck of the Electrical and Building Maintenance Superintendent, whose maintenance workers

(City SMF ¶ 61.)

Although Ray was unable to find that the rope had been placed by Monacacy employees to intimidate or otherwise discriminate against Hollinghead and Simpson, he determined that the "incident [was] very unfortunate," (Doc. 62, Ray Report), and he made a number of recommendations in his report.  Among them, Ray urged the City and its boards and authorities to conduct pre-bid conferences that emphasized to potential contractors that discrimination directed toward any employees was absolutely prohibited.  Ray also recommended that any contractor awarded a bid should be required to sign a certificate of non-discrimination, and to make clear that any discriminatory act found to have been committed on City property would be met with a firm response and potential criminal charges.  (City SMF ¶¶ 62-65, and Doc. 62, Ex. 4, Ray Report)  Ray also provided summary reports to Simpson and Hollinghead regarding the outcome of his investigation into their complaint, and emphasizing the recommendations that he would be making to City officials emphasizing the importance of ensuring non-discriminatory policies were honored and enforced.  (Doc. 62, Ex. F)

In addition to this investigation that Thomas Ray spearheaded, the City of York Police Department undertook its own investigation into the matter pursuant to

---

used the rope in connection with their job duties.  (City SMF ¶¶ 69-70.)

direction from the Mayor.  The matter was assigned to Andy Baez, a detective with the York City Police Department who had been a detective since April 2009, and who had been involved in more than 100 criminal investigations as a detective and police officer.  (Id. ¶¶ 71-74.)  Baez began his investigation on the morning of July 22, 2010, – less than one week after Hollinghead first discovered the rope.  Baez first met with Mark Simpson in a conference room at the Wastewater Treatment Plant, and Simpson provided his version of the events, and showed Baez cell phone photographs of a rope hanging in one of the buildings about which he was complaining.  Baez asked whether the rope was still hanging in the same place, and Simpson said that it was but that it was no longer tied in the form of a noose.  Baez and Simpson went to the location to observe the rope, but found it was no longer there.  Baez took photographs of the location and took measurements of the area where the rope had been depicted in Simpson's photographs.  These measurements indicated that it was approximately 10 feet from the lower metal rail to where the noose was located, leaving approximately five or six feet from the noose to the floor.  (Id. ¶¶ 75-76.)

Baez was also introduced to Greg Meyers, the construction inspector from Buchart-Horn/Basco Associates.  Meyers did not provide any information to indicate that he believed the rope had been placed as a form of intimidation or harassment.

Baez reviewed the photographs that were taken at the Wastewater Treatment

Plan on July 22, 2010.  (Doc. 62, Ex. C)  Baez compared these photographs to a copy

of a photograph that was presented to him as having been taken by an Ostara

representative, which showed a rope hanging from the ceiling.  (City SMF ¶ 79.)

Baez also looked at the cell phone photographs showing the rope tied into the form

of a noose.  (Id.)  Based upon his own observations, Baez concluded that the rope

either could have been configured in such a way in order to move tools and buckets

between the lower and upper floors, or it could have been tied in this fashion to

symbolize a noose.  (Id. ¶ 80.)  However, Baez was unable to conclude that the rope

had been placed in order to intimidate or harass Simpson or Hollinghead, and on

balance he believed it was more likely that the rope was being used for legitimate

construction purposes and not to intimidate or harass other employees.  (Id. ¶ 81.)

Because of the relative scarcity of evidence, including an absence of notes,

letters, or threats made directly to the complainants, Baez's investigation was placed

into "Open" status pending further evidence that might be discovered.  As of August

16, 2010, the date of the Supplemental Police Report, no other information or

evidence had been provided by either Simpson or any other employees at the

Wastewater Treatment Plant.  (Id. ¶ 82.)

After Ray and Baez concluded their own investigations, Michael O'Rourke, the

Business Administrator for the City of York, undertook his own investigation into a

grievance that Hollinghead filed on August 26, 2010, alleging "racial intimidation by outside electrical contractor." (Id. ¶ 84; Ex. 6-A, Grievance.)  Thus, on September 7, 2010, O'Rourke convened a meeting that included Simpson and Hollinghead, as well as James Gross, the Director of Public Works for the City, and Mark Andreozzi, the Business Agent for Teamsters Local 776.  (City SMF ¶ 85.)  At this meeting, O'Rourke allowed Simpson, Hollinghead, and Andreozzi wide latitude to discuss their concerns regarding the incident.  O'Rourke later prepared a report in which he observed that this incident had been investigated by the Deputy Business Administrator for Human Resources and by the York City Police Department.  (Id. ¶ 88.)  O'Rourke was critical of management at the Wastewater Treatment Plant for failing to meet with African-American employees at the plant to reassure them that management would not tolerate any racial discrimination in the workplace, and he was also critical of Simpson and Hollinghead for not more timely reporting the matter to management.  O'Rourke thought that the matter could have been handled better, and he encouraged all involved to act more quickly if there were any similar events reported in the future.  O'Rourke also emphasized that outside contractors would be held to the same standards as City employees in terms of the courtesy, respect, and nondiscriminatory conduct that was expected and required of them.   Finally, O'Rourke noted that the City would commit to taking a more aggressive approach to

discovering culprits found to have been involved in any future incidents.  (Doc. 62, Ex. 6, 6-B)

Following this prompt, multi-faceted response to Hollinghead's concerns, some eleven months then elapsed.  Then, on June 6, 2011, Hollinghead was given a work assignment that involved pouring chlorine into the sand filter in the sand filter building, and monitoring the filter hourly.  (City SMF ¶ 93; Doc. 62, Ex. 1, Deposition of James Hollinghead ("Hollinghead Dep.") at 160-61:22-24)  As a result of this assignment, Hollinghead became sick, sought medical treatment at an emergency room and in follow-up appointments with doctors, and wound up missing five days of work, for which he was paid.  (City SMF ¶ 94; Hollinghead Dep. at 174:11-175:9.)  Hollinghead speculates that he was given this work assignment as retaliation for having filed grievances and complaints regarding the rope incident in July 2010, nearly a year earlier.  Although he claims to have had other disputes with co-workers regarding racially insensitive comments at various times, and suggests without detail that he endured "forms of discipline or things of that nature," (Hollinghead Dep. at 180:20), Hollinghead did not identify any other instances of alleged retaliation, and his entire retaliation claim appears to be based upon the chlorine assignment.  Hollinghead claims that Chad Arnold and Steve Douglas were behind the retaliation.  (Hollinghead Dep. at 177-178.)

As part of the assignment that involved pouring chlorine in the sand filter, the facts indicate that the two maintenance employees who were actually adding the chlorine were Caucasian.  These employees were continuously in the sand filter building for several hours introducing the chemical into the bed of the filter. According to Arnold, he assigned Hollinghead and a trainee to check the water level in the sand filter a couple of times and to keep their eyes on the water level, and to make any adjustments that might be necessary.  Hollinghead appears to dispute this characterization, although his deposition provides relatively little detail about what exactly he was assigned to do to the sand filter.  It is undisputed, however, that Hollinghead became sick following the assignment, required medical treatment, and missed work on paid leave.

Simpson has also claimed that he suffered retaliation as a result of speaking out regarding the incident with the noose or rope, and for pursuing grievances relating to the matter.  Thus, Simpson claims that on March 15, 2011, he was given a dangerous work assignment in retaliation for filing a complaint with the EEOC.  Specifically, Simpson claimed that he was given an assignment to clean up a spill in the centrifuge room, he fell while performing this task, landing on his wrist and back, and that his calls for help were ignored.  (Authority SMF ¶¶ 71-72.)  Simpson had claimed that the City denied his workers' compensation benefits claim stemming from this

incident in retaliation for filing an EEOC complaint.  However, the City of York and Simpson have since resolved this aspect of Simpson's claim, and their settlement of this claim extends to all of Simpson's claims against the City that were brought in this lawsuit.  (Doc. 60, at 2)  Accordingly, Simpson is claiming racial discrimination, retaliation, and related claims only against the York Sewer Authority.  Hollinghead is pressing his claims against both of these parties.

Notably, however, the undisputed facts of this case reveal that neither Hollinghead nor Simpson has ever been employed by the Authority.  The plaintiffs endeavor to argue that the Authority is actually a division or agency of the City, or that the Authority should be deemed one of their employers, but the facts do not bear out this argument.  Indeed, the evidence is uncontroverted that the Authority has zero employees, and instead is managed by a five-member appointed board that serves in a voluntary capacity.

The evidence is undisputed that Hollinghead and Simpson are employed by the City of York, which provides their compensation and employment benefits.  The evidence is also undisputed that all of Hollinghead's and Simpson's work assignments were prescribed by their supervisors – who work for the City of York.  (Authority SMF ¶¶ 36-50 and 74-88.)  It appears that the plaintiffs believe that they should be deemed to be employees of the Authority as well as the City because the

Authority owns the building where the men worked, and because Steve Douglas, the Plant Manager, reported regularly to the Authority.  However, we find no facts in the record to support the plaintiffs' argument that they should be deemed to be employees of two separate legal entities, and instead we conclude that they were employed by the City of York, not the Authority, as explained further below.

The Authority was incorporated under the Municipal Authorities Act of 1945, as later amended on November 27, 1950.  The Authority owns the City's Wastewater Treatment Plant, which is located in Manchester Township, York County.  The plant services the City of York and six neighboring municipalities, and services include sewer collection, regional conveyance, wastewater treatment, and industrial pretreatment compliance.  (Authority SMF ¶¶ 1-2; Doc. 55, Ex. 1 ¶¶ 3-5.)  Although the Authority owns the plant, the Authority is not in possession of the plant and does not operate the plant on a daily basis.  Instead, the City of York is in sole possession of the plant and is charged with responsibility for the day-to-day operations of the plant, pursuant to the terms of a Lease of Sewer System between the Authority and the City, dated September 15, 1987.  The lease, which has been renewed multiple times, remains in effect today.  (Authority SMF ¶ 3; Doc. 55, Ex. 1 ¶ 6.)

The Authority, which consists only of five board members, exists and functions to provide funding for and to oversee capital improvement projects on the Wastewater

Treatment Plant and collection system facilities that are connected to and located throughout the municipalities serviced by the plant.  (Authority SMF ¶ 5.)  The Authority has no employees.  (Id. ¶ 6; Doc. 55, Ex. 1 ¶ 10.)  Steve Douglas was employed by the City of York as the Plant Manager at the Wastewater Treatment Plant. (Authority SMF ¶ 7.) Douglas did frequently attend Authority Board meetings to report on matters pertaining to the operation of the Wastewater Treatment Plant, but he had no voting rights, or any other responsibilities, at Board meetings.  (Id. ¶ 8.)  Douglas would also contact Authority Board members from time to time to provide information about the plant, but the Authority did not supervise Douglas or direct his work activities.  (Id. ¶ 9.)

## III.   PROCEDURAL HISTORY

After exhausting their administrative grievances, Hollinghead and Simpson initiated this action with the filing of a complaint on February 9, 2012.  In the complaint, the plaintiffs named the City of York, the York Sewer Authority, and Monacacy Valley Electric, Inc., as defendants.  On April 9, 2012, the Authority and Monacacy moved to dismiss the complaint, and on April 10, 2012, the City answered with affirmative defenses. On November 8, 2012, the undersigned issued a report and recommendation that recommended dismissal of the complaint, with leave to amend.

On December 12, 2012, the district court adopted the report and recommendation, and on January 2, 2013, the plaintiffs filed an amended complaint.

Monacacy moved to dismiss the amended complaint, whereas the Authority and the City each filed answers.  On June 4, 2013, the undersigned issued a report and recommendation recommending that the claims against Monacacy be dismissed with prejudice.  On July 11, 2013, the report and recommendation was adopted, and Monacacy was dismissed as a defendant in this action.

On July 29, 2013, and August 1, 2013, the Authority and the City respectively moved for summary judgment.  Before the motions were fully briefed, the parties engaged in settlement proceedings before an outside mediator.  These proceedings did not conclude until the end of 2013, at which point it appears that Mark Simpson had settled all of his claims against the City of York, but all other claims remained unresolved.  The motions for summary judgment were fully briefed as of February 28, 2014, and are ripe for disposition.

For the reasons that follow, it is recommended that the motions be granted and the case closed.

IV.  **STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

A party may move for summary judgment, identifying each

18

> claim or defense – or the part of each claim or defense – on
> which summary judgment is sought.  The court shall grant
> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the
> motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its

existence of nonexistence might affect the outcome of the suit under the applicable

substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408,

412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)).  For an issue to be genuine, "all that is required is that sufficient evidence

supporting the claimed factual dispute be shown to require a jury or judge to resolve

the parties' differing versions of the truth at trial."  Id. (quoting Anderson, 477 U.S.

at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party

must show that if the evidence of record were reduced to admissible evidence in

court, it would be insufficient to allow the non-moving party to carry its burden of

proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party

has satisfied this burden, "its opponent must do more than simply show that there is

some metaphysical doubt as to the material facts."  Scott v. Harris, 550 U.S. 372, 380

(2007).  Instead, if the moving party has carried its burden, the non-moving party

must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings. <u>See</u> Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); <u>see also</u> Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Id.</u> at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id.  In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## V.   DISCUSSION

### A.   The Plaintiffs' Claims Against the Authority Fail Because the Evidence is Clear that the Authority Was Not the Plaintiffs' Employer and Because the Authority Took No Action With Respect to the Plaintiffs' Employment or the Allegedly Retaliatory Conduct

In this case, upon consideration, we find that the plaintiffs' claims against the Authority all fail either because the Authority was not the plaintiffs' employer, or otherwise because the evidence fails to show that the Authority had anything to do with the allegedly discriminatory or retaliatory conduct alleged in the Second Amended complaint.

As discussed below, whether or not a party was a plaintiff's "employer" has substantive significance to claims brought under Title VII.  The plaintiffs have claimed that they were employees of both the City of York and the York Sewer Authority, but evidence revealed during discovery in this case reveals that this simply

21

is not the case.  Although the plaintiffs do little to support their assertion, it appears that the plaintiffs are endeavoring to have the Court construe the Authority and the City as co-employers for purposes of Title VII liability.  Although courts will, at times, consider two separate entities to be a single employer for purposes of satisfying Title VII's 15-employee requirement and thus to preserve a plaintiff's claim under Title VII, see Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 85-87 (3d Cir. 2003), the plaintiffs have failed to justify such a result in this case.  The plaintiffs were employed by the City of York, but they were not employed by the Authority, and thus the plaintiffs' claims for unlawful workplace against the Authority under Title VII and the PHRA fail as a matter of law.[3]

---

[3] It is somewhat unclear exactly what the plaintiffs would gain by suing the York Sewer Authority, an entity that has no employees and no payroll, but instead consists of a single five-member board of directors that helps to facilitate the Authority's services and business activities.  None of the individuals with whom the plaintiffs appear to have the greatest dispute – Chad Arnold and Steve Douglas chief among them – are employed by the Authority.  To the contrary, these individuals – and the individuals who investigated this matter – are all employed by the City of York.  In the typical case where a plaintiff seeks to have multiple entities aggregated into a single employer for purposes of Title VII, it is because the plaintiff is attempting to have its nominal employer come within the numerosity requirements of Title VII.  See Nesbit, 347 F.3d 72, 85 (3d Cir. 2003); see also Gift v. Travid Sales Assocs., Inc., 881 F. Supp. 2d 685, 692-93 (E.D. Pa. 2012); Tokash v. Foxco Ins. Mgmt. Servs., Inc., Civ. A. No. 3:10-CV-872, 2012 WL 1677437, at *6-7 (M.D. Pa. May 14, 2012).  It may also reflect an effort to bring in a larger entity as an "employer" because that entity would have greater assets than a smaller employer.  Whatever the reason for seeking consolidation of two or more entities under Title VII, we do not find that the plaintiffs have come

Title VII provides, in relevant part, as follows:

(a)     It shall be an unlawful employment practice for an employer –

(1)     to fail to refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1).  Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ."  42 U.S.C. § 2000e(b).  In this case, the plaintiffs were unquestionably employed by the City of York, which is not disputed to be a proper defendant in a Title VII action.  However, the plaintiffs are also attempting to sue the Authority for alleged discrimination under Title VII and the PHRA, and seemingly are attempting to hold the Authority liable under either a "joint employment" or "single employer" theory.[4]

Courts will recognize a joint employment relationship when "one employer while contracting in good faith with an otherwise independent company, has retained

---

forward with sufficient facts in this case to show that the Authority and the City should be deemed to be a single employer in this case.

[4] Although the parties clearly dispute whether the Authority can be considered as an "employer" of the plaintiffs for Title VII purposes, none of the parties squarely discuss the factors relevant to this consideration, and do not refer to or examine the applicable legal standards.

for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Nat'l Labor Relations Bd. v. Browning-Ferris Indus. of Pa., 691 F.2d 1117, 1123 (3d Cir. 1982). The Third Circuit has recognized this theory of "joint employment" for claims of discrimination under Title VII. See Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997). Although there is a lack of definitive guidance from the Third Circuit Court of Appeals regarding a formal test for joint employment under Title VII, Courts within this circuit will apply the following factors when making this determination:

> (1) [A]uthority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours;
>
> (2) day-to-day supervision of employees, including employee discipline; and
>
> (3) control of employee records, including payroll, insurance, taxes, and the like.

Myers v. Garfield & Johnson Enters., Inc., 679 F. Supp. 2d 598, 607 (E.D. Pa. 2010) (alteration in original); see also Gift v. Travid Sales Assocs., Inc., 881 F. Supp. 2d 685, 690 (E.D. Pa. 2012). Under this test, no single factor is dispositive, and a weak showing on one factor may be overcome by a strong showing on the other two. Myers, 679 F. Supp. 2d at 608. In addition to the three factors cited, "[t]he parties'

beliefs and expectations regarding the relationship between the plaintiff and defendant are also relevant." Id.

Review of these factors and considerations against the factual context of this case substantially undermines the plaintiffs' bare suggestion that the Authority and the City should be considered joint employers of Hollinghead and Simpson. The plaintiffs have pointed to no substantial evidence that would suggest that anyone at the Authority had any ability to hire or fire the plaintiffs, or to make work assignments, or to set the conditions of their employment. Likewise, there is no evidence that anyone at the Authority was providing day-to-day supervision of the employees, or was responsible for employee discipline.[5]

The plaintiffs make much of the fact that the City's Director of Public Works, James Gross, also sits on the Board. The plaintiffs argue that Gross supervised and worked closely with Steve Douglas, who in turn supervised Chad Arnold. Apparently because Douglas and Arnold later assigned work to Simpson and Hollinghead, the plaintiffs contend that James Gross's role as a City official and Authority Board member should be sufficient to cause the Court to find that the plaintiffs were jointly

---

[5] There is evidence that the Wastewater Treatment Plant's Plant Manager, Steve Douglas, reported regularly to the Authority's Board, but this fact alone certainly is insufficient to cause us to find that the Authority and the City were jointly employing Hollinghead and Simpson.

employed by the City and the Authority.  We do not find these facts compel such a finding, and the plaintiffs have cited to no legal authority that would support their argument regarding joint employment.

The Third Circuit has also instructed that in some cases, separate entities may constitute a "single employer" for purposes of Title VII, which involves a slightly different analysis and typically arises in cases where a plaintiff is endeavoring to satisfy the numerosity requirements of Title VII.  There are three circumstances where this may be appropriate:  (1) where the company splits into smaller entities to evade Title VII's minimum employee requirement; (2) where a parent company directs a subsidiary to perform the alleged discrimination at issue in a case; or (3) if the two entities' "affairs are so interconnected that they collectively caused the alleged discriminatory employment practice." Nesbit, 347 F.3d at 86.  There is nothing in the record that causes us to find that the first of these two situations is implicated.

There are, however, some facts that could superficially suggest that the third scenario applies to the facts of this particular case.  Under the third scenario, courts should undertake an equitable inquiry into whether the "operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another." Id. at 87.  The Third Circuit has identified four, non-

exhaustive factors that courts should consider when examining a claim of entity entanglement:

> (1)    the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters),

> (2)    whether they present themselves as a single company such that third parties dealt with them as one unit,

> (3)    whether a parent company covers the salaries, expenses, or losses of its subsidiary,

> (4)    whether one entity does business exclusively with the other.

Id.

Although it certainly appears that there is a certain level of overlap between the functions of the City and the Authority, and although the plaintiffs have referred to official City documents which suggest that the Authority is really nothing more than a "Department" of the City, we nonetheless are unable to conclude that the City and Authority should be collapsed into a single entity for purposes of this litigation. Whereas the plaintiffs rely on little other than argument and unsupported assertion to advance their single employer theory, the Authority has submitted uncontradicted evidence to show that the Authority is a separate legal entity, and does not have any employees, that the Authority does not provide the plaintiffs' work assignments or day-to-day supervision, and does not provide any of their compensation or benefits.

The plaintiffs' argument to the contrary are insufficient to cause us to find that these undisputed facts and legal relationships should be ignored or set aside for purposes of allowing the plaintiffs' to maintain a cause of action against the Authority for violations of Title VII or the PHRA.   Furthermore, we do not perceive the significance of aggregating the Authority and the City in this way in this case, since the plaintiffs have claims against their actual employer, and the very party that they now claim exercises so much control over the Authority that it should be considered a joint employer with the Authority.[6]   Lastly, as discussed further below, there is

_____

[6]  Ironically, the plaintiffs seem to be trying to argue that the smaller, less powerful, employee-less entity should be aggregated with the City that they claim oversees the Authority's business to such a degree that substantive consolidation is warranted.  The plaintiffs have (or in Simpson's case, had) claims for Title VII discrimination and retaliation against their actual employer, the City of Harrisburg. Thus, the plaintiffs do not need to substantively consolidate the City and the Authority to satisfy the numerosity requirement of Title VII.  Accordingly, the purpose of the proposed consolidation is uncertain, but in any event is insufficiently supported by actual evidence.  There is further irony to the effort to have these employers consolidated, since the evidence shows that the City took prompt and assertive action to have Hollinghead's and Simpson's complaints investigated, and to emphasize for all interested parties that discrimination in the workplace was absolutely prohibited.  These essentially undisputed facts cause us to find that the City responded promptly and effectively to the plaintiffs' concerns. If the plaintiffs are attempting to suggest that there is such a close relationship between the Authority and the City that these separate entities should be considered a joint employer, it would seem that the City's swift response to the plaintiffs' complaints would also be imputed to the Authority.  However, because there is insufficient evidence to support the plaintiffs' suggestion that they should be considered employees of both the Authority and the City, we need not consider this issue further.

insufficient evidence that either the City or the Authority violated the plaintiffs' rights under state or federal law, and thus summary judgment would be appropriate regardless of whether the Court were able to consolidate these parties as a single employer, or to consider the plaintiffs as joint employees of the defendants.

We are, of course, mindful that the PHRA differs from Title VII in that it provides that parties other than employers may be liable for unlawful workplace discrimination on the basis of, *inter alia*, race. 43 Pa. Cons. Stat. Ann. § 955(e). The statute specifically forbids "any person, employer, employment agency, labor organization or employee to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful and discriminatory practice. Id.; see also Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996) (individual employer may be held liable in his personal capacity under the PHRA if the individual is a supervisor and the plaintiff can demonstrate that the supervisor aided or furthered the employer's own discriminatory practices). The plaintiffs suggest that they have a viable claim under such an "aiding and abetting" theory in this case.

The plaintiffs' aiding and abetting theory seems to be that because the Authority did not immediately ban Monacacy from the Wastewater Treatment Plant on the basis of the plaintiffs' allegations, as Mayor Bracey suggested would have been her preference, this fact should be construed as evidence that the Authority

actively facilitated workplace discrimination.  On the record before the Court, we do not agree that this argument can allow the plaintiffs' claims against the Authority to go forward under an "aiding and abetting" theory under the PHRA.

First of all, it is unclear exactly how the Authority acted in any way to support what the plaintiffs' perceived as workplace discrimination.  Although the plaintiffs have sued the City of York, the plaintiffs have not identified any evidence to show that the City engaged in workplace discrimination; indeed, the evidence suggests just the opposite, as the record is replete with instances of City officials directing prompt investigations into the plaintiffs' claims, and taking decisive actions to emphasize that discrimination would not be tolerated.  As the plaintiffs' opposition brief makes clear, the plaintiffs are suggesting that the Authority assisted in the workplace discrimination by refusing to terminate or suspend Monacacy's work at the Wastewater Treatment Plant, and they note that Mayor Bracey actually urged Authority officials to take this step in response to the allegations.  But this argument alone fails when considering that the undisputed evidence shows what actually occurred.

The Chairman of the York City Sewer Authority, Joseph T. Hand, has attested that he was first made aware of the alleged noose on July 22, 2010, when he was contacted by Jim Gross, the City's Director of Public Works.  (Doc. 55, Ex. 1, Aff.

of Joseph T. Hand ("Hand Aff.) ¶ 13)   Upon receiving this information, Hand immediately convened a meeting with a representative of Monacacy, the Authority's solicitor, and a representative of Buchart-Horn, the engineering firm that was responsible for overseeing the capital improvement project at the Wastewater Treatment Plant. (<u>Id.</u> ¶ 15.)  That meeting took place on 2:00 p.m. the day Chairman Hand learned of the incident.  (<u>Id.</u>)  According to Hand, he was provided with photographs of the alleged noose, and these were shared with Jim Gross.  (<u>Id.</u> ¶ 16.) Hand met with Larry Smith, a Monacacy vice president, who stated that he was standing by his company's reputation and he denied that Monacacy employees had any involvement in placing a noose in the building, and lacked knowledge about who may have done so.  (<u>Id.</u> ¶ 17.)

Notwithstanding Monacacy's denial of involvement, Chairman Hand took the occasion to remind Smith about Monacacy's contractual obligations, including that it comply with all anti-discrimination provisions contained in the contract documents executed by the Authority and Monacacy prior to the project's commencement. Chairman Hand also emphasized that if Monacacy were found to violate these contract provisions, it could result in the immediate termination of the contract and Monacacy's removal from the project. (<u>Id.</u> ¶ 18.)  Chairman Hand communicated these matters to Jim Gross promptly after the meeting.  (<u>Id.</u> and Hand Aff, Ex. I.)

31

Five days later, Mayor Bracey contacted Chairman Hand directly, and expressed to him her opinion that Monacacy should have been suspended from its work on the project until the names of those involved in the incident were "turned over to the authorities or until the investigation was completed." (Hand Aff, Ex. J, July 27, 2010 email from C. Kim Bracey to Joseph T. Hand.)  Within minutes of receiving this email, Chairman Hand responded to the Mayor and made arrangements to meet with her in person to discuss the matter further.  (Hand Aff, ¶ 20 and Ex. K.) During this meeting, the Mayor amplified her belief that Monacacy should have been removed from the work site as soon as the alleged noose was reported.  In response, Chairman Hand advised that as a contractual matter, the Authority could not simply suspend Monacacy and bar the company from the project based on allegations alone, and the spare information that had by that point been developed about the incident. (Hand Aff. ¶ 21.)   Moreover, Chairman Hand told the Mayor that Monacacy had steadfastly denied having anything to do with the alleged noose, and nobody had any actual evidence to the contrary.  In addition, Chairman Hand observed that Monacacy had been only one of several subcontractors working in the Wastewater Treatment Plant at or around the time that the noose was discovered; some of these contractors were under contract with the Authority, and some were under contract with the City. (Id. ¶ 22.) Nevertheless, Chairman Hand told the Mayor that he had reminded

Monacacy of its continuing obligation to comply with anti-discrimination provisions in its contract documents. (Id. ¶21.)

Chairman Hand also attested that by the time of his meeting with Mayor Bracey, the Mayor had already directed City personnel from the Human Resources Department and the Police Department to investigate the incident. The Mayor did not ask the Authority to undertake its own separate investigation, and Hand deemed it unnecessary to do so in light of the two official investigations that had been commenced. Hand also notes that neither of the plaintiffs contacted the Authority about the alleged noose, and neither of the plaintiffs ever inquired of the Authority about the matter or requested that a separate investigation be conducted. (Id. ¶¶ 23-25.)

The foregoing facts are entirely undisputed by competent, contradictory evidence, and constitute the only facts relevant to the plaintiffs' argument that the Authority aided and abetted workplace discrimination. We submit that these undisputed facts not only do not support a claim that the Authority aided or abetted discrimination, they indicate that the Authority's management actually responded to the matter promptly and transparently. The mere fact that Mayor Bracey initially disagreed with Chairman Hand's failure to suspend Monacacy's work and bar the firm from the job site based on allegations is simply insufficient to support a claim

that the Authority aided and abetted workplace discrimination.  To the contrary, the evidence shows that the Authority looked into the matter, met with officials at the City to address their concerns, and emphasized to Monacacy that discrimination in the workplace was absolutely forbidden.[7]  There is insufficient evidence to bolster the plaintiffs' aiding and abetting theory under the PHRA, regardless of whether the PHRA allows for liability for parties other than "employers".

Furthermore, because we find the evidence to be clear that the Authority was not the plaintiffs' employer, and had no apparent involvement in the discrete instances of workplace retaliatory conduct alleged in the complaint, we also conclude that the plaintiffs' claims for retaliation under both Title VII and the PHRA also necessarily fail.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must come forward with to show that he engaged in activity protected by Title VII, the employer took adverse employment action against him, and there was a causal connection between the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).  Adverse action

---

[7] We note that Monacacy maintained throughout that none of its employees was involved in placing a noose in the Ostara building, and none of the investigations that were undertaken into the plaintiffs' allegations ever concluded that Monacacy employees were involved or that, in fact, the rope was configured as a "noose" rather than for legitimate work purposes.

"extends beyond workplace-related or employment-related retaliatory acts and harm."
Burlington Northern & Santa Fe Railway Co., 548 U.S. 53, 67 (2006).  The focus is
instead on whether the complaining plaintiff was harassed or retaliated against in a
way that might have dissuaded a reasonable employee in the plaintiff's position from
making or supporting a charge of discrimination.  Moore, 461 F.3d at 342.

In this case, the plaintiffs have identified two separate instances of alleged
retaliation.  For his part, Hollinghead claims that he was retaliated against when, in
June 2011, Chad Arnold directed him and a trainee to supervise two Caucasian
employees who were pouring chlorine into the sand filter, and to monitor the water
levels, which resulted in Hollinghead sustaining some injury from inhaling the
chemicals.  Simpson, in turn, claims that he suffered retaliation when, in March 2011,
he was assigned to clean up a spill, he slipped, and nobody responded when he
radioed for assistance.

There is no competent evidence that these work assignments came from, or
were influenced in any apparent way, by the Authority.  There is, in short, no
evidence that the Authority had anything to do with these alleged instances of
retaliation, and the Authority is thus entitled to summary judgment on these claims

as well.[8]

> **B.    The City is Entitled to Summary Judgment on all Claims Because the Evidence Fails to Support Hollinghead's Allegations[9]**
>
> > **1.    Hollinghead's Claims for Discrimination Under Title VII and PHRA Fail**

Under Title VII's anti-discrimination provisions, it is unlawful for an employer

to discriminate against any individual with respect to "compensation, terms,

---

[8] For the same reasons, the plaintiffs' First Amendment retaliation claims also fail against the Authority.  To prove a claim for First Amendment retaliation, a public employee must show that he engaged in activity protected by the First Amendment, that he suffered some sort of adverse action, and that there is a causal connection between the protected activity and the adverse action.  Gorum v. Sessions, 561 F.3d 179, 184 (3d Cir. 2009).  Here, there is insufficient evidence to show that the Authority had anything to do with the allegedly retaliatory work assignments that Hollinghead and Simpson received months after complaining about the alleged noose, and since these are the only instances of alleged retaliation in this case, the claims fails against the Authority.  Similarly, the plaintiffs' Equal Protection claim, apparently based on an assertion that the plaintiffs were treated differently than other "similarly situated" employees, fails as a matter of law.  (Second Am. Compl. ¶ 83.)  To prove an equal protection claim under the "class of one" theory as alleged, the plaintiffs must show that the Authority, acting under color of state law, intentionally treated the plaintiffs different from other similarly situated employees, and there was no rational basis for the difference in treatment.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (2004).  The plaintiffs were not employed by the Authority, and the plaintiffs have not come forward with any evidence to show that the Authority treated them differently than any other employee in any respect.  There is no evidence of disparate or unequal treatment, and this claim fails for lack of proof.

[9] As noted, Simpson has settled all of his claims against the City and only Hollinghead's claims remain.

36

conditions, or privileges of employment" or to "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of the individual's race.  42 U.S.C. § 2000e-2(a).  In order to prevail under Title VII, the plaintiff must satisfy the burden-shifting allocation and order of proof that was first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  The plaintiff bears the initial burden of establishing a *prima facie* case of racial discrimination.  Under that standard, a plaintiff must show that he is a member of a protected class, he was qualified for his position, he was subjected to an adverse employment action, and the action was taken under circumstances giving rise to an inference of unlawful discrimination.  Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

If a plaintiff can make out a *prima facie* case of racial discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory purpose for its adverse employment action.  Hicks, 509 U.S. at 506-07.  If the defendant carries this burden, the plaintiff is obligated to come forward with evidence to show that the defendant's proffered reasons for the actions taken were pretextual cover for discrimination.  Id.

The "ultimate burden of persuading the trier of facts" rests at all times with the plaintiff.  Burdine, 450 U.S. at 253.  In order to survive a motion for summary judgment where the defendant-employer has satisfied its evidentiary burden of stating a legitimate, non-discriminatory purpose for its actions, the plaintiff must provide either direct or circumstantial evidence of pretext that has "sufficient probative force from which the fact finder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Alers v. City of Philadelphia, 919 F. Supp. 2d 528, 543 (E.D. Pa. 2013) (quoting Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998)).

Racial discrimination claims may also be brought upon a theory of a hostile work environment, based upon the idea that workplace discrimination may, in some cases, alter the terms and conditions of employment.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64-65 (2006).  In order to succeed on a claim based upon a hostile work environment theory, a plaintiff must prove:  (1) he suffered intentional discrimination because of his race; (2) the discrimination he suffered was severe and pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same race in the same position;

and (5) the existence of *respondeat superior* liability.  Alers, 919 F. Supp. 2d at 543

(citing Davis v. City of Newark, 285 F. App'x 899, 902 (3d Cir. 2008)).  Factors that

may indicate the existence of a hostile work environment may include "the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23

(1993).  In contrast, "offhanded comments[ ] and isolated incidents (unless extremely

serious) are not sufficient to sustain a hostile work environment claim.  Rather, the

conduct must be extreme to amount to a change in the terms and conditions of

employment." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (citations

and internal quotation marks omitted).

When evaluating the severity and pervasiveness of alleged workplace

discrimination, courts will examine to totality of the circumstances rather than

concentrating on individual incidents.  Peace-Wickham v. Walls, 409 F. App'x 512,

519 (3d Cir. 2010).  An employer will be vicariously liable for racially discriminatory

acts taken by supervisory employees who create a hostile work environment that

amounts to employment discrimination.  Faragher v. City of Boca Raton, 524 U.S.

775, 780 (1998).  In cases where a co-worker is the source of alleged harassment, a

plaintiff must show that the employer failed to provide reasonable channels for

complaints or otherwise failed to take appropriate remedial actions once it learns about the workplace harassment.  <u>Weston v. Pa.</u>, 251 F.3d 420, 427 (3d Cir. 2001).

Under any of the foregoing theories of workplace discrimination, we are constrained to find that Hollinghead's claims fail on their merits.  In so finding, we in no way demean the seriousness of Hollinghead's claims, nor do we dismiss the strong and hurtful feelings that witnessing what he believed to be a noose may have invoked for Hollinghead.  Instead, we conclude only that the evidence developed in this case simply does not support a claim for workplace discrimination against the City of York under what appear to be largely undisputed facts.

As a threshold matter, there is simply no evidence that the City of York had any involvement of any kind with the alleged noose, or the rope, that Hollinghead discovered in the Wastewater Treatment Plant in July 2010.  Indeed, Hollinghead does not know who placed the rope in this location, though he strongly believes it was not anyone from the City, but instead one or more unidentified employees of Monacacy.  Despite two official investigations into this matter, it was never determined how the rope came to be placed where Hollinghead discovered it.  For purposes of this report, it is enough to note that there is no evidence at all that the City of York had any involvement in the placement of the rope.

Additionally, the evidence shows that officials with the City of York acted promptly and decisively to look into Hollinghead's claims.  Hollinghead discovered the rope on July 16, 2010, and he told Simpson about it on July 18, 2010.  Simpson reported the incident to Chad Arnold on July 19, 2010, and officials with the Human Resources and the Police Department were soon after ordered to investigate the matter.  These investigations were undertaken on July 22, 2010, – very shortly after the matter was first brought to the City's attention.  Although Hollinghead quarrels with some aspects of these investigations, he does little more than to fault them, and he does not persuasively show that the City failed to take his allegations seriously, or in any way discriminated against him in its handling of this matter.

In any event, the facts of record show that the City caused to be undertaken a thorough and prompt investigation into the incident, and the investigations included: (1) Chad Arnold speaking with employees of Buchart-Horn to discuss the incident and potential involvement of subcontractors; (2) Arnold viewing the offending rope; (3) Thomas Ray, the Deputy Business Administrator for Human Resources undertaking an investigation to determine if the rope had been placed for a racially motivated purpose or to intimidate African-American employees; and (4) Mayor Bracey directing the City's Police Department to look into whether a hate crime may have been committed.

Thomas Ray began his investigation immediately, and interviewed multiple individuals employed by the City, as well as representatives of Monacacy and other contractors and interested parties working in the Wastewater Treatment Plant at that time.  Ray also spoke with both of the plaintiffs and with Steve Douglas, and took into consideration photographs depicting one or more ropes dangling from the upper railings of the building that were in place before Hollinghead discovered the rope on July 16, 2010.  Ray ultimately produced a report that concluded that while it was possible that the rope had been configured in a noose form and placed to intimidate African-American employees, he could not establish that this was the case, and it was equally possible that the rope had been used for legitimate construction purposes. Ray was also unable to determine who placed the rope in the building.  Despite finding the incident unfortunate, Ray was not able conclusively to find that the incident was one of racial intimidation.

Likewise, York City Detective Andy Baez conducted an investigation to determine whether a hate crime may have occurred.  This investigation began on July 22, 2010, and involved discussions with at least Simpson and possibly Hollinghead,[10] and review of the physical location and photographs that had been taken of the

---

[10] Detective Baez's notes reflect that he spoke with Hollinghead, but Hollinghead denies that they ever talked.

alleged noose. Like Ray, Baez was unable to reach a definite finding that the rope had been placed for discriminatory reasons, and he also found it was just as likely that the rope was being used as part of the construction activity in the plant. Baez noted that there was a lack of other evidence to substantiate a finding of discrimination, but he left his case in an "open" status to allow for the consideration of future evidence that might be forthcoming. As of August 16, 2010, the date of the Supplemental Police Report, no further incidents or information had been reported to the police by Simpson, Hollinghead, or any other parties at the plant.

In addition to these formal investigations, in September 2010, Michael O'Rourke, the Business Administrator for the City held a meeting with Hollinghead, Simpson, and their union representative, Mark Andreozzi, during which the plaintiffs had wide latitude to discuss issues or concerns that they had regarding the rope that was found in July. O'Rourke prepared his own report, which was critical that management at the Wastewater Treatment Plant failed to meet with African-American employees to reassure them that management would not tolerate racial intimidation in the workplace, and he was also critical of Simpson and Hollinghead for not reporting the matter more promptly to management, and of management for not investigating more quickly. O'Rourke accepted the grievance that had been filed, and urged all parties in the future to act more promptly in order to ensure that

investigations could be quickly undertaken, and for the City to emphasize to contracting parties that they would be held to the standards of courtesy, respect, and non-discrimination that the City expected of its own employees.

In marked contrast to these robust facts that show a thorough and entirely non-discriminatory response to Simpson's and Hollinghead's complaints, the record is devoid of any evidence showing that the City subjected Hollinghead to an adverse employment action on the basis of his race. Hollinghead suggests that his assignment to clean a filter in the sand filter building in July 2011 was racially motivated, or otherwise constituted unlawful retaliation for complaining about alleged discrimination. However, there is little in the record to substantiate Hollinghead's interpretation of this lone incident. Instead, the record shows that on July 6, 2011 – nearly 11 months after the incident involving the discovery of an alleged noose – Hollinghead and a trainee were assigned to a job that involved adding chlorine to a sand filter and monitoring its levels hourly. Hollinghead became sickened after this assignment, obtained medical treatment, and missed five days of work, for which he was paid. The employees who were actually adding chlorine to the sand filter were Caucasian, and were actually exposed to the chemicals more several hours during their part of the job. Other than Hollinghead's own speculation that this assignment was related to his race or complaints of prior discrimination, there is no actual

evidence that this assignment constituted an unlawful employment action, but appears instead to have been a legitimate, non-discriminatory work assignment.

For all of the foregoing reasons, we conclude that the record does not support Hollinghead's claims for unlawful racial discrimination under Title VII or the PHRA, and we thus recommend that the City's motion for summary judgment be granted.

### 2. Hollinghead's Claims for Retaliation under Title VII, Section 1983 and the PHRA Fail as a Matter of Law

As discussed above, to prevail on a claim of First Amendment retaliation, or retaliation under Title VII or the parallel PHRA, a plaintiff must show that he engaged in protected activity, the employer took an adverse action against him, and there was a causal connection between the protected activity and the adverse employment action.  Gorum v. Sessions, 561 F.3d 179, 184 (3d Cir. 2009); Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006) (First Amendment) Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (Title VII).  Importantly, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events" unless the time is "unusually suggestive".  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also Krouse v.

Am. Sterilizer, 126 F.3d 494, 503-04 (3d Cir. 1997) ("When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."); Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (PHRA); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (First Amendment).  In general, then, to establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  Id.  In the absence of that proof, a plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of fact should infer causation."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

Guided by these legal considerations, we find it clear that the City is entitled to summary judgment on Hollinghead's claims of unlawful retaliation, whether those claims are brought under Title VII, the PHRA, or Section 1983 for First Amendment retaliation.  There is simply no evidence permitting an inference of a causal link between the single alleged adverse employment action that took place as a result of a workplace assignment in June 2011, and the incidents involving Hollinghead's discovery of the alleged noose 11 months earlier in July 2010.  Not only is there no temporal connection between these incidents, Hollinghead admitted during his

deposition that he does not believe that the City took any other retaliatory acts in response to his reporting of the noose and filing an EEOC complaint. The record does not support Hollinghead's claim, and summary judgment is warranted.

### 3. Hollinghead's Monell Claims for Alleged Constitutional Violations Fail

Finally, Hollinghead has brought claims against the City for alleged constitutional violations, including apparently a claim that the City violated his right to equal protection. This claim fails because Hollinghead had failed to identify any evidence to support a claim for municipal liability under the stringent standards that apply to such claims.

Hollinghead bases his claim for municipal liability for alleged constitutional violations on Monell v. New York Department of Social Services, 436 U.S. 658 (1978), which teaches that municipalities and other bodies of local government may be liable under § 1983 only if they have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Id. at 690. Municipal liability may lie under Monell where an unconstitutional practice is "so permanent and well settled as to constitute a custom or usage with the force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). In addition, municipal liability for unconstitutional acts may occur when a

final decision-maker approves a subordinate's actions, <u>McGreevy v. Stroup</u>, 413 F.3d 359, 367 (3d Cir. 2005), and in cases where although no rule has been announced as policy but federal law has been violated by an act of a policymaker, <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 584 (3d Cir. 2003); <u>see also</u> <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 409 (1997) (evidence showing a single violation of federal rights can, under appropriate facts, be sufficient to trigger municipal liability).   Even in cases where an individual lacks final policymaking authority to bind the municipality, the municipality may nevertheless be liable if it delegates the individual the authority to act or if it acquiesced to the conduct.   <u>See</u> <u>LaVerdure v. County of Montgomery</u>, 324 F.3d 123, 125-26 (3d Cir. 2003).   With respect to policymaking authority, a municipal official will be deemed to have such authority, and be capable of binding the municipality by his or her conduct if he or she has "final and unreviewable" authority in an area of municipal policy.   <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 245 (3d Cir. 2006).

In this case, the plaintiff has failed to come forward with evidence to show that the City maintained policies that were the moving force behind any of the constitutional violations alleged in this case.   There is no evidence that any City employee with policymaking authority enacted unlawful policies or endorsed the unlawful conduct of subordinate employees, or that the City failed to train its

employees, and the record is entirely devoid of evidence to show that the City knew

of, tolerated, or endorsed a pattern of constitutional violations. Instead, the complaint

contains allegations concerning a discrete incident, and the record indicates that

policymakers and City officials reacted promptly and decisively when Hollinghead

and Simpson reported their concerns in July 2010. There is no evidence of a

constitutional violation with respect to Hollinghead's June 2011 work assignment in

the sand filter room, and there is certainly no evidence that this work assignment was

the result of official policy or a failure to train Chad Arnold, who gave Hollinghead

the assignment. Upon consideration of the entire record, we find it clear that

Hollinghead's <u>Monell</u> claims lack evidentiary support and should be dismissed.

## VI.   **RECOMMENDATION**

For all of the foregoing reasons, IT IS RECOMMENDED THAT the pending

motions for summary judgment (Docs. 55, 59) be GRANTED, judgment entered in

favor of all defendants, and the case marked closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within fourteen
> (14) days after being served with a copy thereof. Such party shall file
> with the clerk of court, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the portions of the

proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 7th day of March, 2014.


*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge